IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE MUSHROOM DIRECT | : | Master File NO. 06-0620 |
| PURCHASER ANTITRUST | : | |
| LITIGATION | : | NOS.  06-0638; 06-0657; |
| | : | 06-0677; 06-0861; |
| THIS DOCUMENT RELATES TO: | : | 06-0932; 06-1464; |
| All Actions | : | 06-1854 |

O'NEILL, J.                                                                                  March   26   , 2009

MEMORANDUM

This is an antitrust case involving the applicability of the Capper-Volstead exemption for

agricultural cooperatives.  Discovery was phased with Phase One concerning the Capper-

Volstead issue.  Presently before me are the motions for summary judgment filed by defendant

Mushroom Alliance, Inc., defendant Kitchen Pride Mushrooms, defendant M.D. Basciani &

Sons, Inc., defendant Eastern Mushroom Marketing Cooperative, Inc. ("EMMC")[1] and certain

defendants,[2] defendant JM Farms and defendant Franklin Farms, plaintiffs' omnibus response,

---

[1]  The EMMC's motion is one for partial summary judgment as it does not seek summary judgment at this time on plaintiffs' claims for monopolization, attempted monopolization or claims under Section 7 of the Clayton Act.

[2]  The following defendants are included as "certain defendants" in the EMMC's motion: Eastern Mushroom Marketing Cooperative, Inc.; Kaolin Mushroom Farms, Inc.; To-Jo Fresh Mushrooms, Inc.; Cardile Mushrooms, Inc.; Mario Cutone Mushroom Co., Inc.; Cardile Bros. Mushrooms, Packaging; Monterey Mushrooms, Inc.; Phillips Mushrooms Farms, LP; Modern Mushroom Farms, Inc.; Sher-Rockee Mushroom Farm; C&C Carriage Mushroom Co.; John Pia; Michael Pia; Brownstone Mushroom Farms, Inc.; Robert A. Ferato T/A Bella Mushroom; Farms, Inc.; Forest Mushroom, Inc.; Gaspari Bros. Inc.; Gino Gaspari & Sons, Inc.; Giorgi Mushroom Company; Giorgio Foods, Inc.; Harvest Fresh Farms, Inc.; Leone Pizzini and Son, Inc.; Louis M. Marson, Jr., Inc.; LRP Mushrooms, Inc.; LRP-M Mushrooms LLC; Oakshire Mushroom Farm, Inc.; South Mill Mushroom Sales, Inc.; United Mushroom Farms Cooperative, Inc.; and Country Fresh Farms, Inc.

The following defendants joined in the motion filed by the EMMC defendants:  M.D. Basciani & Sons, Inc.; Mushroom Alliance, Inc.; Kitchen Pride Mushrooms; JM Farms; and

and some defendants' replies thereto;[3] the motion for summary judgment filed by consolidated plaintiffs, responses by some defendants and plaintiffs' omnibus reply; and the motion to strike filed by plaintiffs All American Mushroom, Inc., Robert Altman and Associate Grocers, Inc.,[4] responses by some defendants and plaintiffs' reply thereto.  The parties have submitted voluminous exhibits including witness depositions from the various entities involved in this litigation.

BACKGROUND

The history between the parties to this antitrust lawsuit is lengthy, convoluted and contentious; thus, I will begin by identifying some of the relevant entities at issue in the current motions and the undisputed facts regarding their structure and provide a limited recitation of the relevant procedural history.

I.    Factual History

Incorporated in the Commonwealth of Pennsylvania and headquartered in Kennett Square, Pennsylvania, the EMMC is a large mushroom cooperative comprised of entities that grow, buy, sell, package and ship mushrooms to retail and food service outlets across the United States.  The list of defendants includes mushroom growers, packagers, sellers, distributors and other related entities that were either members or affiliates of members of the EMMC.

It is undisputed that from 2001 to 2005, the EMMC adapted and amended various

Franklin Farms.

[3]  Defendants Masha & Toto, Inc., T/A M&T Mushrooms and W&P Mushroom Inc. have not joined in or filed separate motions for summary judgment.

[4]  The motion to strike is to exclude the portions of defendants' motions that are beyond the scope of Phase One discovery.

minimum pricing policies for mushrooms sold to the fresh market. Defendants assert that these policies had exceptions, were not enforced by the EMMC and were routinely not followed by members. It is undisputed that member dues were based on the number of pounds of mushrooms that were sold to the fresh market by the distributor operations and not the amount grown by the growing operations.

According to the undisputed facts, M. Cutone Mushroom Co., Inc., joined the EMMC on January 20, 2001. M. Cutone is one of several mushroom related companies owned by the Cutone family that defendants allege are commonly owned, controlled and operated by Mario Cutone, his wife and their three adult sons. M&V Enterprises is also owned by the Cutone family and grows mushrooms and sells or transfers 100% of the mushrooms it grows to M. Cutone Avondale which transfers them to M. Cutone Chelsea along with other mushrooms it purchases. The address on Cutone's EMMC membership agreement bears the M. Cutone Chelsea address and the letterhead describes M. Cutone as "Receivers and Commission Merchants Fruits, Vegetables and Flowers." M. Cutone does not grow mushrooms. The EMMC minimum pricing applied to M. Cutone's sales to its wholesale and retail customers.

Kaolin Mushroom Farms, Inc. joined the EMMC on January 9, 2001. South Mill Mushroom Sales Inc. is a mushroom marketer, packer and shipper. Both Kaolin and South Mill are jointly owned and operated by John and Michael Pia, each of whom have a 50% interest in each company. John and Michael Pia, through 100% ownership in two companies, Pennsylvania Mushroom Distribution, Inc. and Mushroom Substrate Technologies, Inc., held a 50% ownership interest in four companies that operated mushroom distribution centers in Dallas, Houston, New Orleans and Atlanta. The remaining 50% ownership interest in the distribution centers was held

by Stuart Thomas through his ownership of Thomas Mushroom Distribution Inc. and Dallas South Mill Inc.  The Kaolin/South Mill distribution centers were not EMMC members, did not grow mushrooms but sold mushrooms grown by defendant Kaolin.  The Kaolin/South Mill distribution centers adhered to EMMC minimums in their mushroom sales.  Defendants assert that the distribution centers were contractually obligated to price mushrooms at prices specified by Kaolin/South Mill.

LRP-M Mushrooms LLC joined the EMMC on January 9, 2001.  The Articles of Incorporation for LRP-M were filed in January 2001.  Dominic Manfredini and his nephew Lucio Pizzini each have a 50% ownership interest in LRP-M.  Lucio Pizzini also owns LRP Mushrooms.  LRP grows mushrooms on land leased to him by Dominic Manfredini.  Both LRP-M and LRP sell 100% of their mushrooms to Manfredini Enterprises, Inc., which buys, packages and markets produce including mushrooms.  Manfredini Enterprises is owned by the wife of Dominic Manfredini and Dominic Manfredini serves as its president and operator.  Manfredini Enterprises does not grow mushrooms.  The mushrooms that Manfredini Enterprises acquired from LRP-M account for 20-25% of the mushrooms that Manfredini Enterprises resold to its customers.  EMMC minimum pricing applied to sales by Manfredini Enterprises.

Although it will not be addressed in this opinion because the only issue upon which discovery was conducted was the EMMC's Capper-Volstead immunity, as background, plaintiffs assert that defendants allegedly launched a "supply control" campaign by using membership funds collected during 2001 and 2002 to acquire and subsequently dismantle non-EMMC mushroom growing operations in order to support and maintain artificial price increases. Plaintiffs allege that the  EMMC repeatedly would purchase a mushroom farm or a parcel of

4

farmland and then sell or exchange that farm or parcel at a loss, attaching a permanent or long-term deed restriction to the land prohibiting the conduct of any business related to the growing of mushrooms. Plaintiffs cite several specific examples of this alleged practice during 2001 and 2002.

Plaintiffs further allege that defendants collectively interfered with non-EMMC growers that sought to sell at prices below those set by the EMMC and pressured independent growers to join the EMMC. The pressure and coercion tactics alleged include threatening and/or implementing a group boycott in which EMMC members would not sell mushrooms to assist independent growers in satisfying their short-term supply needs and/or selling mushrooms to independent growers at inflated prices.

II.    Procedural History

On December 16, 2004, the United States Department of Justice filed an antitrust complaint against the EMMC after an eighteen-month investigation of the EMMC's membership activities, qualifications as a cooperative and marketing practices. United States v. E. Mushroom Mktg. Coop., Inc., Civil Action No. 04-CV-5829 (E.D. Pa. Dec. 16, 2004). On September 9, 2005, final judgment was entered, pursuant to which the United States and the EMMC agreed to file documents nullifying deed restrictions placed on six parcels sold or transferred by the EMMC and to impose no similar deed restrictions on other properties for the next ten years.[5]

On June 26, 2006, plaintiffs, direct purchasers of mushrooms, filed a consolidated

---

[5] Some defendants rely on the final judgment of the DOJ in asserting that the EMMC is properly formed under the Capper-Volstead Act. However, the Competitive Impact Statement specifically states that "the Final Judgment has no prima facie effect in any subsequent lawsuits that may be brought against the Defendants."

5

amended antitrust class action under federal law against defendants, the EMMC, thirty-seven members, officers and affiliates of members, and unidentified members and/or co-conspirators during the class period (collectively, "defendants"), alleging that defendants engaged in an illegal scheme and conspiracy to cause plaintiffs to pay artificially inflated prices for mushrooms from January 2001 to date of filing.  Plaintiffs filed their consolidated amended antitrust class action complaint pursuant to my June 5, 2006 Order consolidating seven class actions and one non-class action previously filed against defendants to promote judicial economy and avoid duplication. The consolidated actions include the Class Action Complaint, the Giant Eagle Amended Complaint and the Publix Amended Complaint.

Specifically, plaintiffs brought this action to recover treble damages, equitable relief, costs of suit and reasonable attorneys' fees pursuant to the Clayton Act, 15 U.S.C. §§ 15(a) and 26 (2007), for defendants' alleged violations of the anti-competitive conspiracy, monopolization and attempted monopolization provisions of the Sherman Act, 15 U.S.C. §§ 1 and 2, and the unlawful acquisition provision of the Clayton Act, 15 U.S.C. § 18.

On April 25, 2007, I granted defendants' motions to dismiss Count II of plaintiffs' consolidated amended complaint for monopolization and attempted monopolization under Section 2 of the Sherman Act as to all defendants other than defendant EMMC and denied defendants' motion to dismiss in all other respects.

On August 8, 2007, I ordered phased discovery with Phase One discovery limited to:  (1) whether all members of the EMMC are mushroom growers; (2) facts regarding the vertical integration of EMMC members; (3) whether any third parties conspired with the EMMC or any of its members to violate the antitrust laws; and (4) whether any parties were coerced, threatened

or pressured by defendants to participate, join or conspire with the EMMC or any of its members

to violate the antitrust laws.  In my Order of April 17, 2008, I stated that "[t]he purpose of

phasing discovery was to facilitate a determination on the issue of Capper-Volstead immunity at

the earliest possible stage in the litigation."  My January 8, 2008 Order stated that "Phase One

must encroach upon the merits of plaintiffs' claims to some extent and achieving an impermeable

divide between Phase One and the merits was never the goal of phased discovery in this case."

In my February 12, 2008 Order, I allowed discovery under Phase One of "all communications

between [defendants] and any members of the EMMC and/or the EMMCGA . . . ." and "all

documents concerning the 'supply control' campaign . . . ."

## STANDARD OF REVIEW

Rule 56(c) of the Federal Rules of Civil Procedure provides, in relevant part, that

summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and

any affidavits show that there is no genuine issue as to any material fact and that the movant is

entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  An issue of material fact is

genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving

party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  Summary judgment will be

granted "against a party who fails to make a showing sufficient to establish the existence of an

element essential to that party's case, and on which that party will bear the burden of proof at

trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

The party moving for summary judgment has the burden of demonstrating that there are

no genuine issues of material fact.  Id. at 322-23.  If the moving party sustains the burden, the

nonmoving party must set forth facts demonstrating the existence of a genuine issue for trial.  See

Anderson, 477 U.S. at 255.  Rule 56(e) provides that when a properly supported motion for summary judgment is made, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).  The adverse party therefore must raise "more than a mere scintilla of evidence in its favor" in order to overcome a summary judgment motion, and cannot survive by relying on unsupported assertions, conclusory allegations, or mere suspicions.  Williams v. Borough of W. Chester, 891 F.2d 458, 460 (3d Cir. 1989).  However, the "existence of disputed issues of material fact should be ascertained by resolving 'all inferences, doubts and issues of credibility against'" the moving party.  Ely v. Hall's Motor Transit Co., 590 F.2d 62, 66 (3d Cir. 1978), quoting Smith v. Pittsburgh Gage & Supply Co., 464 F.2d 870, 878 (3d Cir. 1972).

Several courts have noted that summary disposition of antitrust cases is difficult because of their inherent factual complexity and because motive and intent are paramount considerations. See e.g., Poller v. Columbia Broadcasting Sys., Inc., 368 U.S. 464, 473 (1962); Hayden Publishing Co. v. Cox Broadcasting Corp., 730 F.2d 64, 68 (2d Cir. 1984).  However, complexity does not mean that summary disposition is thereby precluded or even disfavored in antitrust law. Capital Imaging Assoc., P.C. v. Mohawk Valley Medical Assoc., Inc., 996 F.2d 537, 541 (2d Cir. 1993).  Rather, summary judgment may be particularly important in antitrust cases to prevent lengthy and drawn-out litigation that has a chilling effect on competitive market forces.  Id.  The present motions will be considered in light of these standards.

Defendants are moving for summary judgment with respect to plaintiffs' claims under Section 1 and the conspiracy claims under Section 2 on the ground that they are exempt under the

8

Capper-Volstead Act.  Thus, defendants have the burden of proof to show that EMMC qualifies

as a Capper-Volstead cooperative.  See El v. Southeastern Penn. Trans. Auth., 479 F.3d 232, 237

(3d Cir. 2006).  Plaintiffs filed cross motions for summary judgment and have the burden of

proving their allegations that vitiate the  EMMC's alleged immunity as well as their ultimate

claims of conspiracy under Section 1 and 2.  See Cosmetic Gallery, Inc. v. Schoeneman Corp.,

495 F.3d 46, 55 (3d Cir. 2007).

DISCUSSION

Plaintiffs allege that defendants violated Sections 1 and 2 of the Sherman Act as well as

Section 7 of the Clayton Act.  Phase One discovery was limited to determining the issue of

whether defendants are entitled to Capper-Volstead exemption for plaintiffs' conspiracy claims

under Sections 1 and 2 of the Sherman Act.  Defendants' motions for summary judgment claim

that they are entitled to summary judgment because they are exempt and, even if they were not

immune, some defendants claim that plaintiffs have failed to assert any basis for holding them

specifically liable.[6]  Plaintiffs have filed a cross motion for summary judgment on defendants'

affirmative defense of Capper-Volstead exemption.

Section 1 of the Sherman Act provides:  "Every contract, combination in the form of trust

---

[6] Defendants Mushroom Alliance, Kitchen Pride, Basciani & Sons, Inc., JM Farms, Michael Pia, John Pia, Giorgio Foods Inc., Gaspari Bros. Inc., and LRP Mushroom Inc. claim that regardless of the exemption determination their motions for summary judgment on plaintiffs' claims against them should be granted.  Because Phase One discovery was narrowly focused on facts implicating the Capper-Volstead exception, I will dismiss without prejudice all of defendants' arguments not pertaining to Capper-Volstead because resolution at this stage would be premature.  While some of the discovery may have allowed for plaintiffs to discover facts relating to defendants' individualized arguments, the nature of the Capper-Volstead exemption did not require plaintiffs to do so at this stage and I find sufficient their Rule 56(f) affidavit stating that discovery on such issues is still necessary.

or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal."  15 U.S.C. § 1.  Section 2 of the Sherman Act provides: "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony."  15 U.S.C. § 2.  A related statute, the Clayton Act, provides plaintiffs with the right of private action to vindicate violations of the Sherman Act.  15 U.S.C. §§ 4 and 16.

The Capper-Volstead Act provides agricultural cooperatives a limited exemption from antitrust laws.  See Nat'l Broiler Mktg. Ass'n v. United States, 436 U.S. 816, 822 (1977); Md. & Va. Milk Producers Ass'n, Inc. v. United States, 362 U.S. 458, 466-67 (1960).  The Act states, in relevant part:

> Persons engaged in the production of agricultural products as farmers, planters, ranchmen, dairymen, nut or fruit growers may act together in associations, corporate or otherwise, with or without capital stock, in collectively processing, preparing for market, handling, and marketing in interstate and foreign commerce, such products of persons so engaged.  Such associations may have marketing agencies in common; and such associations and their members may make the necessary contracts and agreements to effect such purposes:  Provided, however, That such associations are operated for the mutual benefit of the members thereof .
> . . .

7 U.S.C. § 291.  The Capper-Volstead Act clarified and expanded the antitrust exemption for cooperatives found in Section 6 of the Clayton Act, which states, in relevant part:

> Nothing contained in the antitrust laws shall be construed to forbid the existence and operation of labor, agricultural or horticultural organizations instituted for the purposes of mutual help . . . or forbid or restrain individual members of such organizations from lawfully carrying out the legitimate objects thereof; nor shall such organizations, or the members thereof, be held or construed to be illegal combinations or conspiracies in restraint of trade under the antitrust laws.

15. U.S.C. § 17.  In Maryland & Virginia Milk Producers, the Supreme Court recognized that the

Act and its legislative history "indicate[] a purpose to make it possible for farmer-producers to organize together, set association policy, fix prices at which their cooperative will sell their produce, and otherwise carry on like a business corporation without thereby violating the antitrust laws." 362 U.S. at 466.  Defendants argue that no genuine issues of material fact exist regarding their qualification for the Capper-Volstead exemption.  However, plaintiffs argue that defendants are not entitled to the Capper-Volstead exemption because non-growers are members of the cooperative and that the EMMC and its members conspired with non-members to fix prices.[7]

I..     Non-Grower Members

As the Supreme Court has made clear, for defendants to be exempt from antitrust liability under the Capper-Volstead Act, they must establish not only that the EMMC was entitled to the Act's protection but also that all of the entities that were members of the EMMC were likewise qualified under the Act.[8]  Nat'l Broiler, 436 U.S. at 822-23.  The Supreme Court held that even one non-farmer member in a cooperative disqualifies a cooperative from claiming the Capper-

---

[7]   Plaintiffs also argue that the Capper-Volstead immunity is destroyed because (1) defendants fail to satisfy the 50% rule to qualify as a valid cooperative for Capper-Volstead exemption; (2) defendants entered into multiple agreements with persons or entities not engaged in agricultural production in addition to their actions of fixing prices; and (3) defendants engaged in the types of anticompetitive and predatory practices that fall outside the legitimate objects of an agricultural cooperative.  As plaintiffs need only prove one defect that deprives defendant of exemption under Capper-Volstead and  genuine issues of material fact exist as to many of these arguments, I need not address each argument and the legal issues they raise if I find one sufficient to destroy the exemption.

[8]   Specifically, defendants must establish that the EMMC is a valid Capper-Volstead cooperative by showing all of the following: 1) all of the members of the cooperative are producers of agricultural products; 2) each member of the cooperative only gets one vote regardless of its size; 3) the cooperative "does not pay dividends on stock or membership capital in excess of 8 per centum per annum;" and 4) at least 50% of the products dealt with by the cooperative are products of its members.  7 U.S.C. § 291.  The last element is commonly referred to as the 50% Rule.

Volstead exemption.[9] Id. at 826-828.  This decision was consistent with the Court's previous

holding in Case-Swayne Co., Inc. v. Sunkist Growers, Inc. (Sunkist II), 389 U.S. 384 (1967), in

which it denied the Capper-Volstead exemption to a citrus growers association because

approximately 15% of its members were non-farmer producers.  Both cases held that even one

"middleman" infiltrated into an otherwise exempt cooperative destroys Capper-Volstead

immunity.  Sunkist II, 389 U.S. at 395-96.  Accordingly, if non-producers participate as members

in an agricultural cooperative, that cooperative is not entitled to avail itself of the Capper-Volstead

exemption.  Id.

"[W]hen agricultural industries vertically integrate, including non-farmer middlemen such

as processors, the economic role of these middlemen exceeds the conduct Congress intended to

permit through the Capper-Volstead exemption.  Ripplemeyer v. Nat'l Grape Co-op. Ass'n, Inc.,

807 F. Supp. 1439, 1457 (W.D. Ark. 1992).  In Ripplemeyer, the court held that inclusion of a

wholly-owned subsidiary which was a processor as a member of an agricultural cooperative

destroyed Capper-Volstead immunity.  Id.[10]

Thus, while the exemption provides a limited immunity to farm cooperatives from

antitrust litigation, the uncontested nature of M. Cutone forecloses application of the Capper-

_____

[9] Thus, some defendants' arguments that they are proper members of the EMMC are
irrelevant.

[10] Defendants claims that Ripplemeyer should be read in full.  In Ripplemeyer, both the
parent and subsidiary were members of the agricultural cooperative and the court found that
inclusion of the non-grower processor as a member destroyed Capper-Volstead immunity but that
the two entities could not conspire because their parent-subsidiary relationship meant that they
were not separate entities capable of conspiring.  Ripplemeyer, 807 F. Supp. at 1459.  I find M.
Cutone to be an improper member of the EMMC for the same reason that the processor in
Ripplemeyer destroyed immunity.  And here, unlike in Ripplemeyer, the grower entity affiliated
with M. Cutone, M & V Enterprises, was not a member of the cooperative.

Volstead exemption.  In this case, there is no dispute that M. Cutone Chelsea, an EMMC member, is a non-farmer processor.  As such, its presence as a member of the agricultural cooperative destroys Capper-Volstead immunity.

While defendants concede in their reply to plaintiffs' motion for summary judgment that EMMC member M. Cutone is a mushroom distributor and not a grower, they argue that this is a technical, de minimis violation that should not act to destroy the cooperative's Capper-Volstead immunity.  Defendants argue that, because there is complete identity of ownership between M. Cutone, which is not a grower, and M & V, which is a grower, M. Cutone is properly a member of the EMMC and that the cooperative should not lose immunity because M. Cutone registered the wrong company owned by his family.  Defendants cite Alexander v. National Farmers Organization, 687 F.2d 1173, 1186 (8th Cir. 1982), for the proposition that a technical, de minimis error in record keeping should not preclude application of the Capper-Volstead exemption to an otherwise exempt cooperative organized for the benefit of true agricultural producers.  However, this case is distinguishable.  In Alexander, the court held that a cooperative operating for the protection of dairymen whose bylaws prohibited non-farmers from voting was entitled to Capper-Volstead Act protection though it had received $25 membership donations, not fees or dues, from a small number of non-farmers with no connection to the dairy industry, had never been to a meeting and had not exerted any control over the cooperative as the result of careless record keeping.  Id. at 1185-87.   In this context, then, a "member" has been held to be a person with voting rights in the association.  See also Agritronics Corp. v. Nat'l Dairy Herd Ass'n, 1994 WL 542203, at *4 (N.D. N.Y. Sept. 22, 1994), holding that a "member," for purposes of the Capper-Volstead Act, is someone with the power to participate in the control and policy making

of the association through voting or some equivalent form of power and that, "[s]imply put, if a member does not have any input into the affairs of the association, surely, such member should not be able to destroy the immunity which the association would otherwise enjoy."

Though M. Cutone is affiliated with M & V Enterprises, a grower of mushrooms which defendants claim has the same owners as M. Cutone, this cannot be considered a de minimis exception because it is undisputed that M. Cutone was a non-grower member who had the power to participate in the control and policy making of the association through voting.  Notably, in Alexander there was no suggestion "that dairy industry processors were members of NFO." Alexander, 687 F.2d at 1186.[11]  Here, M. Cutone is a mushroom distributor and a middleman, the

---

[11]  The Alexander Court noted that the NFO was exactly the kind of "populist farm organization contemplated by the Capper Volstead Act."  Alexander, 687 F.2d at 1186-87.  The court cited Justice Brennan's concurrence in Nat'l Broiler, noting that the Capper-Volstead Act was designed to allow farmers to band together "in order to survive against the economically dominant manufacturing, supplier, and purchasing interests with which they had to interrelate" Nat'l Broiler, 436 U.S. at 830, and that it would be "cruelly ironic to exempt large co-ops [that are] professionally managed and operated by many non-farmers-while denying exemption to the farmers who banded together in NFO."  Alexander, 687 F.2d at 1186-87.

However, the EMMC appears to be exactly the kind of cooperative foreseen in Justice Brennan's concurrence and discussed in United States v. Hinote, 823 F. Supp. 1350, 1358 (S.D. Miss. 1993):  a cooperative made of "fully integrated producer[s] of agricultural products performing its own processing . . . and which hence does not associate for purposes of common handling, processing, and marketing is nevertheless 'engaged in the production of agricultural products as [a] farme [r]' for purposes of § 1's exemption . . . if also engaged in traditional farming activity."  Nat'l Broiler, 436 U.S. at 834.  I will discuss below whether members of the EMMC are properly integrated so as to be considered a single entity that produces and distributes.

It is troubling that the EMMC appears to have been organized for the benefit of mushroom distributors, whether fully integrated or whether affiliated, rather than for the benefit of the grower members.  This is demonstrated by the fact that dues were based not on the pounds grown by the member growers but by the total number of pounds sold by the affiliated or integrated distributors.  Under this system, some small growers contributing under 25% of the total pounds of mushrooms sold by their affiliated distributor paid dues based on the distributors' sales, not their own.  This cannot but harm growers.  Additionally, the price fixing in which the EMMC admits it participated was applied to integrated and affiliated distributors' sales and not

14

very type of entity from which Capper-Volstead was designed to protect the interests of farmer/producers.[12]

As previously noted, the existence of even one non-farmer member in an agricultural cooperative is sufficient to destroy Capper-Volstead immunity.  Nat'l Broiler, 436 U.S. at 826-29.  Registering a non-grower as a member of the EMMC is an indication of the EMMC's true purpose:  to benefit distributors rather than growers.  Thus, I cannot excuse the inclusion of M. Cutone as a participating member of the EMMC as a de minimis technicality.[13]

II.    Conspiracy with Non-Members

Even if all EMMC members satisfied the requirements to qualify the cooperative for the

_____

at the growers level.  Additionally, the EMMC did not have pure growers unaffiliated with a distributor as members; instead, it helped them to organize the EMMCGA which was to benefit pure growers.  In combination, these undisputed facts show that protecting true growers was not the purpose of the organization.  While the cooperative "give[s] the set-up the color of a producer rather than a handler[,] [t]he plan adopted was ingenious but transparent."  See United States v. Elm Spring Farm, Inc., 38 F. Supp. 508, 511 (D. Mass. 1941).

[12]  Defendants also suggest that the Nat'l Broiler line of cases does not apply to distributors like M. Cutone but merely to processors.  However, Nat'l Broiler includes both processors and distributors in its conception of the middlemen from whom Capper-Volstead and related exemptions to anti-trust laws were created to protect farmers and producers.  Nat'l Broiler, 436 U.S. at 825-826, noting that the Capper-Volstead Act was passed because "[f]armers were seen as being caught in the hands of *processors and distributors* who, because of their position in the market and their relative economic strength, were able to take from the farmer a good share of whatever profits might be available from agricultural production.  By allowing farmers to join together in cooperatives, Congress hoped to bolster their market strength and to improve their ability to weather adverse economic periods and to deal with processors and distributors," emphasis added.

[13]  As I have found that the EMMC is not exempt under Capper-Volstead by including M. Cutone as a member when it is not a grower, it was not necessary that I extend my analysis to other members of the EMMC which plaintiffs allege have problematic memberships including Leone Pizzini and Son, Inc., Brownstone Mushroom Farms, Inc., and LRP-M Mushrooms LLC, I make no determination at this time as to whether genuine issues of material fact exist as to these members

Capper-Volstead exemption, the exemption does not extend to protect cooperatives that conspire with non-cooperatives.  The Capper-Volstead Act was not intended to create an absolute shield from antitrust liability for agricultural cooperatives.  Courts have held that where an agricultural cooperative acts in concert or enters into an agreement with persons or entities not engaged in agricultural production the Capper-Volstead exemption does not apply.  See e.g., Nat'l Broiler, 436 U.S. at 827-28; United States v. Borden Co., 308 U.S. 188, 204-05 (1939), holding that "[t]he right of these agricultural producers thus to unite in preparing for market and in marketing their products, and to make the contracts which are necessary for that collaboration, cannot be deemed to authorize any combination or conspiracy with other persons in restraint of trade that these producers may see fit to devise."  Cooperatives cannot, for example, conspire or combine with nonexempt entities to fix prices or control supply, even though such activities are lawful when engaged in by cooperatives alone.  Alexander, 687 F.2d at 1182 (8th Cir. 1982), citing Borden, 308 U.S. at 207-208.  Additionally, a cooperative "cannot enter into agreements with persons not engaged in agricultural production [] for the purpose of acquiring monopoly power."  Holly Sugar Corp. v. Goshen County Coop. Beet Growers Ass'n, 725 F.2d 564, 569 (10th Cir. 1984).

To establish a conspiracy in violation of the Sherman Act under Section 1 and Section 2, plaintiffs must allege and eventually prove:  (1) concerted action by defendants; (2) that produced anti-competitive effects within the relevant product and geographic markets; (3) that involved illegal conduct or purpose and (4) that proximately caused injury to plaintiffs.  See Gordon v. Lewistown Hosp., 423 F.3d 184, 207, 207 n.16 (3d Cir. 2005), stating that "[c]laims for conspiracy to monopolize under Section 2 of the Sherman Act also require evidence of a conspiracy"; Mathews v. Lancaster Gen. Hosp., 87 F.3d 624, 639 (3d Cir. 1996).

Plaintiffs argue that defendants engaged in price fixing with affiliated distributors Kaolin/South Mill distribution centers and Manfredini.[14]  These affliated distributors are affiliated with member growers Kaolin and LRP-M, respectively.

Horizontal price fixing is per se illegal.  See e.g., U.S. v. Socony-Vacuum Oil Co., 310 U.S. 150, 223 (1940), declaring per se illegal any agreement "formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity in interstate or foreign commerce;" Alexander, 687 F.2d at 1183.  When an action engaged in is per se illegal, further examination of the practice's impact on the market is unnecessary to find that it produced adverse, anticompetitive effects within relevant product and geographic markets.  See Pace Elecs., Inc. v. Canon Computer Sys., Inc., 213 F.3d 118, 123 (3d Cir. 2000), stating that "[the per se] standard, which is based on considerations of 'business certainty and litigation efficiency,' allows a court to presume that certain limited classes of conduct have an anticompetitive effect without engaging in the type of involved, market-specific analysis ordinarily necessary to reach such a conclusion."

It is undisputed that from 2001 through 2005, the EMMC adopted and amended various minimum pricing polices and that these prices applied to the sales of mushrooms of the distributors at issue.  Because price fixing is per se illegal, whether a conspiracy exists to destroy the EMMC's exemption depends on whether the entities that plaintiffs allege engaged in the conspiracy with the EMMC and its members can be co-conspirators.

---

[14]  Plaintiffs also argue that defendants engaged in price fixing with affliated distributors Masha and Buona.  I will not consider the issue of whether a conspiracy exists with these entities because it appears that genuine issues of material fact may exist.  I need not make such a determination at this time, however, because the relevant facts with regard to with Kaolin/South Mill distribution centers and Manfredini Enterprises are undisputed.

The essence of concerted action is the existence of an agreement.  Gordon, 423 F.3d at 207, citing Mathews, 87 F.3d at 639.  "Unilateral action simply does not support liability; there must be a 'unity of purpose or a common design and understanding or a meeting of the minds in an unlawful arrangement.'"  Id., quoting Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 771 (1984), internal citations omitted.  Concerted action is established where two or more distinct entities have agreed to take action against the plaintiff.  See Weiss v. York Hosp., 745 F.2d 786, 812 (3d Cir. 1984).  The Supreme Court has determined that agricultural cooperatives, like corporations, do not have the plurality of actors necessary for a conspiracy.  See Sunkist Growers, Inc. v. Winckler & Smith Citrus Prods. Co. (Sunkist I), 370 U.S. 19, 27-29 (1962).

Defendants argue that there is no unlawful conspiracy between the EMMC and its members and Kaolin/South Mill distribution centers and Manfrendini even though these distributors sold at EMMC prices.  They assert that Copperweld and Sunkist I support that these distributors were a single economic entity with an EMMC grower because each EMMC member and its affiliated distributors are commonly owned and operated.[15]  Thus, defendants argue that if

---

[15]  Defendants also claim that they are a proper cooperative because they are set up to allow some of their growers to have the packaging and sale of their produce done through wholly-owned affiliates as was the case in the re-organized Sunkist cooperative examined in Case-Swayne Co., Inc. v. Sunkist Growers, Inc., 355 F. Supp. 408 (C.D. Cal. 1971) and the lettuce producer cooperative in N. Cal. Supermarkets Inc. v. Cent. Cal. Lettuce Producers' Coop., 413 F. Supp. 984 (N.D. Cal. 1976).  However, these cases are distinguishable.

First, the reorganized Sunkist cooperative's structure eliminated the non-grower members that were at issue in Sunkist II.  Sunkist, 413 F. Supp. at 413, 415.  Instead these entities became licensed packing houses with contracts with the growers or local cooperative to provide packaging services.  Id.  Some growers had their own packaging facilities.  Id.  However, the licensed packing houses had no vote, control or property rights in Sunkist.  Id. at 415.  While mushroom growers sold their mushrooms to the distributors who resold them at the cooperative's fixed price, the growers in Sunkist did not sell their product to these packagers.  The growers in Sunkist sold their produce through the cooperative.  Id. at 412.

Additionally, in N. Cal. Supermarkets Inc. the facts provide no indication that varying

the alleged distributor co-conspirators and their affiliated member growers are a single economic unit then price fixing with the EMMC at the distribution level is permissible because as a cooperative the plurality of actors required for a conspiracy is absent.

In Sunkist I, the Court held that 12,000 growers organized into three legal entities constituted in practical effect and in the contemplation of the statutory exemption one organization or association incapable of conspiracy under the antitrust laws. Sunkist I, 370 U.S. at 29. Unlike Sunkist I, the facts here do not involve whether cooperatives in which all the members are growers can conspire with each other. Instead, defendants are arguing the alleged co-conspirators are a single economic unit with member growers being a part of the EMMC. Therefore, Sunkist I is not applicable.

In Copperweld, the Supreme Court held that a firm and its wholly-owned subsidiary are not capable of conspiring in violation of § 1 of the Sherman Act. Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 771 (1984). The fundamental question was whether the parent and its wholly-owned subsidiary constituted one economic actor or two. Siegel Transfer, Inc. v. Carrier Exp., Inc., 54 F.3d 1125, 1132 (3d Cir. 1995). The Supreme Court held in Copperweld that:

> there can be little doubt that the operations of a corporate enterprise organized into divisions must be judged as the conduct of a single actor . . . . A division within a corporate structure pursues the common interests of the whole rather than interests separate from those of the corporation itself . . . . Because coordination between a corporation and its division does not represent a sudden joining of two independent sources of economic power previously pursuing separate interests, it is not an activity that

---

ownerships existed in the case and the analysis did not involve the issue of conspiracy and status as a single entity; thus the case was not helpful in my analysis of the organizational structures in this case. N. Cal. Supermarkets Inc., 413 F. Supp. at 985-94. Instead, it appears the member defendants involved were all "growershippers." Id. at 986.

warrants § 1 scrutiny.

Copperweld, 467 U.S. at 770-71 (footnote omitted).  Similarly, the Court concluded that the

control a parent wields over its wholly-owned subsidiary supports their shared "unity of purpose

or a common design" that prevents them from being able to conspire together.  Siegel Transfer,

Inc., 54 F.3d at 1132, quoting Copperweld, 467 U.S. at 771-72.  The Court stated

> [a] parent and its wholly owned subsidiary have a complete unity of interest.  Their
> objectives are common, not disparate; their general corporate actions are guided or
> determined not by two separate corporate consciousnesses, but one . . . .  If a parent and a
> wholly owned subsidiary do "agree" to a course of action, there is no sudden joining of
> economic resources that had previously served different interests, and there is no
> justification for § 1 scrutiny. . . . [A] parent and a wholly owned subsidiary always have a
> "unity of purpose or a common design."  They share a common purpose whether or not the
> parent keeps a tight rein over the subsidiary; the parent may assert full control at any
> moment if the subsidiary fails to act in the parent's best interests.

Copperweld, 467 U.S. at 771-72, internal citations omitted.  The Copperweld Court limited its

holding to a parent and its wholly-owned subsidiary but encouraged courts to analyze the

substance, not the form, of economic arrangements when determining whether a separately

incorporated entity is cable of conspiring.  Siegel Transfer, Inc., 54 F.3d at 1132; Copperweld,

467 U.S. at 773 n.21.

Courts have extended Copperweld to situations involving sibling-subsidiaries of the same

parent corporation, see e.g., Eichorn v. AT & T Corp., 248 F.3d 131, 139 (3d Cir. 2001), and

franchisors and franchisees because the plenary control of the franchisor and the common

economic goals[16] makes them a single entity, see Williams v. I.B. Fischer Nevada, 999 F.2d 445

---

[16]   The common economic goals included the franchisor acting to minimize competition and promote uniformity between franchises, each franchise benefitting from an enhanced reputation for uniformity in quality results and economic unity of interest continuing beyond the payment by the franchisee of the licensing fee to the franchisor receiving a royalty fee and a marketing fee based upon a percentage of the restaurants' gross sales.  Williams, 794 F. Supp. at

(9th Cir. 1993), referencing the application of the facts in <u>Williams v. Nevada</u>, 794 F. Supp. 1026, 1032 (D. Nev. 1992).  The Court of Appeals for the Fifth Circuit extended <u>Copperweld</u> to find that separate corporations commonly owned by three men, two of whom owned 30% of each corporation and one of whom owned the remaining 40% of each corporation were incapable of conspiring because each co-owner maintained equal control over each corporation and had an equal interest in their success.  <u>Century Oil Tool, Inc. v. Production Specialities, Inc.</u>, 737 F.3d 1316, 1317 (5th Cir. 1984).

The Court of Appeals for the Third Circuit extended <u>Copperweld</u> to permit a de minimis deviation of 99.92% ownership from 100% ownership and recognized that courts have deviated in situations where parental ownership was in the 80% to 91.9% range.  <u>Siegel</u>, 54 F.3d at 1133, 1133 n.7.  The Court of Appeals also extended <u>Copperweld</u> to find that a corporation and its agents and two corporations with different ownership could not conspire because they had a unity of interest.  <u>Id.</u> at 1135.  The Court found that a corporation and its agents could not conspire when their economic interests were entirely congruent because the agents received a commission from the corporation and therefore did not compete with it.  <u>Id.</u>  Additionally, the Court found that the two corporations operated as a single economic unit unable to conspire because the one was contractually obligated to manage the others' affairs and received a percentage of the revenues as its fee for this management so that their economic success was directly congruent and they were not competitors.  <u>Id.</u>  None of these decisions extend <u>Copperweld</u> "to shelter independent actors having diverse economic interests acting jointly."  <u>Fishman v. Estate of Wirtz</u>, 807 F.2d 520, 541 (7th Cir. 1986).  I will evaluate the facts of this case as to the substance of the entities to see if

---

1032.

they are one economic unit.

Kaolin/South Mill was owned by two men each with a 50% ownership interest.  Those two men had a 50% interest in the distribution centers during the relevant period with another man who also had a 50% interest in the distribution centers.  This 50% deviation in complete ownership and control is too significant to call de minimis.  Moreover, the individuals do not hav equal control over each corporation.  See Century Oil Tool, 737 F.3d at 1317.  The lack of unity of interest is particularly evident with this affiliation as a lawsuit ensued between Kaolin/South Mill and a distribution center.  It is hard to imagine how interests could have been congruent and control exercised to constitute "one consciousness" when litigation occurred between the entities.

LRP-M was also owned by two men each with a 50% ownership interest, Dominic Mandfredini and his nephew Lucio Pizzini.  The affiliated distributor, Manfredini Enterprises, was owned by Dominic Manfredini's wife and Dominic Manfredini served as president and operator.  As with Kaolin/South Mill, even if Dominic Manfredini's role as president and operator is sufficient to demonstrate 100% control over Manfredini Enterprises, his 50% interest in LRP-M shows a lack of equal control over both entities.  See id.

While some overlap existed in ownership between the affiliated distributors and the member growers, they were not under common control in the same sense as is a corporation and its wholly-owned subsidiary, a corporation and its divisions or as are two corporations owned in identical proportions by the same set of investors.  See Copperweld, 467 U.S. at 770-72; Century Oil Tool, 737 F.2d at 1317.  The affiliated distributors do not have 100% ownership or a de minimis deviation from complete ownership and there is no indication that the overlapping owners would have control independent of their co-owners.  The varying ownership between the

22

affiliated entities shows they are not controlled by a single decision-maker.  See HealthAmerican Pa, Inc. v. Susquehanna Health Sys., 278 F. Supp.2d 423 (M.D. Pa. 2003), holding that the hospitals could not conspire because they were controlled by a single decision-maker, the Alliance.

The involvement of family relationships in these varying ownerships is immaterial to determining common ownership and control.  That partners in a company or between companies are related by blood or marriage--no matter how closely--does not ensure that they will uniformly agree on how to control the companies.  Merely because two people are related does not mean that they have the same views and interests in their family businesses.  See e.g., Doeblers' Pennsylvania Hybrids, Inc. v. Doebler, 442 F.3d 812, 814 (3d Cir. 2006); E. & J. Gallo Winery v. Gallo Cattle Co., 967 F.2d 1280, 1297 (9th Cir. 1992); Zen Investments, LLC v. Unbreakable Lock Co., 2006 WL 1582333, *4 (E.D. Pa. June 2, 2006); Levy v. Levy, 1992 WL 151779, at *1 (E.D. Pa. June 23, 1992); Platt v. Richardson, 1989 WL 159584, at *5 (M.D. Pa. June 6, 1989).  To hold otherwise would be to create an untenably blurry test in which courts must investigate the degree of the entities' family connections to determine whether they qualify as a single entity unable to engage in conspiracies.

Further, since ownership is neither complete nor a de minimis deviation from 100%, there can be no unity of interest between the growers and distributors in this case.  Unlike the entities in Siegel that had separate ownership but shared unity of interest, there is no commission or percentage of revenue fee to make the economic success of either corporation dependent upon the other.  Here, the growers are selling to distributors who sell at EMMC prices.  The undisputed facts are that LRP-M sells all of its mushrooms to Manfredini, and that Kaolin sells its

mushrooms to the distributions centers.[17]  In this relationship, the price fixing does not protect the economic interests of the grower and therefore the entities' interests are not congruent.  Moreover, the undisputed fact that dues were based on the total sales of the affiliated distributors rather than the mushrooms grown by the member grower shows that the growers were not the focus of the EMMC; the Capper-Volstead Act sought to protect growers.  See Agritronics Corp. v. Nat'l Dairy Herd Ass'n, Inc., 914 F. Supp. 814, 826 (N.D. N.Y. 1996).  To agree with defendants would be to hold that the Capper-Volstead Act is not designed to protect growers from middlemen.[18]  The entities lacked the "complete unity of interest" necessary to find them a "single enterprise." Copperweld, 467 U.S. at 771.  No case law has been provided to the contrary.  Thus, for the EMMC and its members to fix prices with affiliated distributors when the distributors are not a single economic unit with their affiliated member grower constitutes a conspiracy that destroys the EMMC's Capper-Volstead exemption.  For the above reasons, I conclude that defendants are not entitled to the Capper-Volstead exemption.

An appropriate Order follows.

---

[17]  The argument that Kaolin contracted with the distribution centers to sell at EMMC prices does not change the facts that these entities were selling at EMMC prices and that the owners of the member grower were advocating for the benefit of the distribution centers they also partly owned instead of at a level that benefitted their grower entity.

[18]  Although I do not so conclude, holding that these entities are a single entity would permit cooperatives to avoid the 50 % rule by counting only the mushrooms of the member growers in the calculations rather than using the affiliated distributors' mushrooms.  This would create a loophole to benefit distributors contrary to the Capper-Volstead exemption's stated purpose of benefitting growers.  Although in this case the defendants appear to have included affiliated distributor sales in their 50% calculation, the treatment of these entities as a single unit with the member grower for purposes of the 50% rule does not alter the analysis of whether they legally are a single unit.

24

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE MUSHROOM DIRECT | : | Master File NO. 06-0620 |
| PURCHASER ANTITRUST | : | |
| LITIGATION | : | NOS.  06-0638; 06-0657; |
| | : | 06-0677; 06-0861; |
| THIS DOCUMENT RELATES TO: | : | 06-0932; 06-1464; |
| All Actions | : | 06-1854 |

ORDER

AND NOW, on this    26th    day of March 2009, upon consideration of the motions

for summary judgment on the issue of Capper-Volstead exemption filed by the EMMC (Doc. No.

245), the Mushroom Alliance, Inc. (Doc. No. 239), Kitchen Pride Mushrooms (Doc. No. 243 and

251), M.D. Basciani & Sons, Inc. (Doc. No. 244), JM Farms (Doc. No. 246), Franklin Farms, Inc.

(Doc. No. 247), plaintiffs' response, and defendants' replies, it is hereby ORDERED that said

motions are DENIED.  Upon consideration of plaintiffs' cross motion for summary judgment on

the issue of Capper-Volstead immunity (Doc. No. 250), defendants responses, and plaintiffs reply,

it is hereby ORDERED that such motion is GRANTED.  All other motions to dismiss claims

against individual defendants unrelated to Capper-Volstead immunity are denied without

prejudice.  Plaintiffs motion to strike (Doc. No. 270) is DISMISSED as moot.

/s/ THOMAS N. O'NEILL, JR.
THOMAS N. O'NEILL, JR., J.